DANIEL GAGE, INC. *vs.* GEORGE P. KIMBALL.

Middlesex.    October 2, 1934. — November 27, 1934.

Present: RUGG, C.J., CROSBY, PIERCE, FIELD, & DONAHUE, JJ.

*Sale,* Transfer of title, Risk of loss. *Contract,* Construction. *Evidence,* Presumptions and burden of proof.

A contract in writing for the sale of all the ice then in a certain ice house of the seller provided for the removal of the ice by the buyer within a certain period of time and for weekly payments at a certain rate per ton removed, but did not contain a specific provision as to the time when title to the ice should pass. Shortly after the expiration of the period so set for removal, some of the ice was destroyed by

fire while still in the ice house. At the trial of an action for the purchase price of that ice, there was evidence that the parties orally had extended the period for removal of the ice to a date after the date of the fire, and conflicting evidence bearing on the intention of the parties as to the time when title should pass. The main issue was whether title to the ice in question had passed at the time when it was destroyed. It was undisputed that at the time of the making of the contract the ice was "specific goods, in a deliverable state" within the meaning of G. L. (Ter. Ed.) c. 106, § 21, Rule 1. The trial judge denied a motion that a verdict be ordered for the plaintiff. The jury, in answer to a special question, found that at the time of the fire title had not passed to the defendant. *Held*, that

(1) A request by the plaintiff for a ruling that a provision in the contract, that "the time of each payment for the ice is of the essence of this contract," had no bearing upon the question, whether title had passed from the plaintiff to the defendant at the time of the fire, properly was refused;

(2) It was proper to refuse a request by the plaintiff for a ruling, based on G. L. (Ter. Ed.) c. 106, § 24, that "If delivery of the ice was delayed through the fault of the defendant and through the failure of the defendant to remove the ice within the time allowed him under the contract . . . or any modification thereof, the goods are at the risk of the defendant as regards any loss which might not have occurred but for such fault or failure to remove";

(3) While the burden of going forward to prove the "different intention" specified in G. L. (Ter. Ed.) c. 106, § 21, was on the defendant, the burden of establishing its absence remained with the plaintiff, and, there being evidence to show such "different intention," it was proper to refuse a ruling that "the burden of proving" such "different intention" had not been sustained by the defendant;

(4) The denial of the motion that a verdict be ordered for the plaintiff was proper.

CONTRACT. Writ dated January 27, 1931.

The action was tried in the Superior Court before *F. T. Hammond*, J. Material evidence and exceptions saved by the plaintiff are described in the opinion. There was a verdict for the plaintiff in the sum of $172.14. The plaintiff alleged exceptions.

*M. G. Rogers*, for the plaintiff.

*E. J. Tierney*, (*L. B. Phister* with him,) for the defendant.

PIERCE, J. This is an action of contract in two counts to recover the price of ice, "sold and delivered" to the defendant under a sealed agreement which reads: "AGREEMENT made this twentieth day of March, 1930 between Daniel Gage, Inc., a Massachusetts corporation having

a usual place of business in Lowell, Massachusetts, and George Kimball of Malden, Massachusetts. The said corporation agrees to sell and the said Kimball agrees to buy all the ice now in the houses of said corporation at North Littleton, Massachusetts, payments to be made weekly by the buyer at the rate of seventy-five cents (75c) per ton, the weight for the purposes of this contract to be the same as the weight estimated by the railroad company which receives shipments of ice at the ice houses at North Littleton. The buyer agrees to remove all of the ice the subject of this contract at once and in no event to leave any ice on the premises of said corporation after Sept. 1, 1930. It is agreed that the time of each payment for the ice is of the essence of this contract. It is further agreed that the ice which is the subject of this contract shall not be sold by said Kimball for direct or indirect distribution in any part of the territory where the said corporation operates at Lowell, and it is agreed that this last stipulation is also of the essence of the contract. Witness our hands and seals this twentieth day of March, 1930. Daniel Gage, Inc. By F. Arthur Osterman Its Vice-President & General Manager. George P. Kimball.''

The defendant admitted that ''the weight estimated by the railroad company which received shipments of ice at the ice houses of the plaintiff in North Littleton in 1930 was the weight shown by the railroad scales at Lowell when the ice from said houses at North Littleton reached Lowell.'' He also admitted ''that from June 11, 1930 to and including June 14, 1930, he or his employees or agents removed from the ice houses of the plaintiff at North Littleton 403,400 pounds of ice for which . . . he owed the plaintiff $151.27.''

The vice-president and general manager of the plaintiff corporation, whose authority to act for and bind the plaintiff is not questioned, testified as follows: In the spring of 1930 the plaintiff had ice houses and ice in them at North Littleton and other places. The ice in the houses at North Littleton had been cut in the winter of 1928–1929, and consequently had stayed over one summer in the ice houses

and was called "two-year ice." Before March, 1930, the manager had a conversation with the defendant relative to the buying of this ice, and, as a result of this conversation, by appointment he met the defendant at said ice houses. There an employee of the plaintiff uncovered a block of ice and took it outside for examination by the defendant. The defendant looked at it and talked about the sale of it. Thereafter, on March 20, 1930, the plaintiff and the defendant executed the paper, above quoted, at the office of the plaintiff in Lowell. The manager further testified, in substance, that he talked with the defendant about the insurance of the ice, told him that the plaintiff had the ice insured, and asked him if he would care to have the policy indorsed to him; that the defendant said "no," that he wanted to give it to a friend if there was any profit in it and that he would take care of the insurance. The manager told the defendant "he would cancel the plaintiff's policy in a matter of a day or two afterwards," and did so.

Respecting the matter of insurance of the ice the defendant testified that "there was a conversation about insurance on the ice in which Mr. Osterman [the manager] told him he was going to cancel his insurance; that this conversation was very soon after the signing of the contract, whether the next day or two days after . . . [he] could not say; that he told Osterman not to cancel the insurance; that he did not consider the ice to be his ice until it was on the cars, but would take it up with Mac-Dougall, because the ice had been resold to MacDougall and if MacDougall wanted to put insurance on, it was up to him 'but we would place it through my brother-in-law'; that there was nothing in the agreement with Mac-Dougall that compelled him to place insurance on the ice; that his agreement with MacDougall was just an oral agreement."

The manager testified, in substance, that he met the defendant by appointment at the ice houses in North Littleton in June, 1930, after the defendant had taken out several cars of ice; that the defendant said he was

going to close the house and move to South Chelmsford and take the ice in the North Littleton houses out later in the season; and that he (the witness) said that was all right with him. He later testified that there was no mutual understanding arrived at in June that the ice should stay in the North Littleton houses until cold weather; that he understood the defendant's statement to be that the ice would stay there until later in the season, that is, until the first of September, which was the time for removal provided by the agreement, and that the talk about leaving it until later was "a matter of conversation." He further testified that he went to North Littleton in June to see that the ice was covered properly because if it was not covered properly it would melt faster and the plaintiff had to stand the melting as the ice was to be weighed in Lowell; that the defendant did not ask him to come out there and notice the condition of the ice, and did not tell him that the ice in the houses was not fit to ship; that the defendant did not say to him, "I think the best thing we can do is to let this alone until cold weather, because if we try to ship it to Lowell there won't be any in Lowell when the cars get there."

The defendant testified as to this conversation as follows: MacDougall, to whom the ice had been resold by the defendant, in the presence of the defendant told Osterman that the "ice wasn't fit to ship and couldn't be handled in the retail business and that he couldn't take any more ice out of the ice house." "Osterman had some ice taken up, at least two or three tiers, to see if the thickness had changed in going down." It had not, so the defendant simply told Osterman that no more ice could be taken out of that ice house through MacDougall. Osterman said "it was all right, to try and take out what they could, the best of it." MacDougall said "it would be no use, there would be too much of a shrinkage," and that he would "take it out later in the fall, in cold weather." Osterman replied that "he had not put the ice in the house; that the old Daniel Gage company had put it in the ice house and that he didn't know the condition of

the ice." When the cakes were exposed to view Osterman said "only to take out the good ice."

On September 15, 1930, the plaintiff sent a letter to the defendant, the material part of which reads: "We have been expecting to see you, especially since the MacDougall fiasco and have wondered just what was being done about the North Littleton ice. According to our interpretation of the contract, the ice is yours and really should have been removed long ago." On October 22, 1930, a fire consumed the North Littleton ice houses. On October 24, 1930, the plaintiff sent the defendant the following letter: "This is to notify you that we have suffered a complete loss by fire at our North Littleton plant. Everything has been destroyed and, as far as I can see, you will be unable to salvage any of the ice. Please report this loss to your insurance agents for their immediate attention." On November 17, 1930, the plaintiff sent the defendant the following letter: "At the time of our meeting, some two weeks ago, you wanted some time to consider the matter of the North Littleton fire loss. I assume that you have carefully considered this and can possibly offer some solution. Please advise." On November 28, 1930, the plaintiff sent the defendant the following letter: "Some few days ago, we wrote you regarding ice destroyed at North Littleton. Up to the present time, we have received no reply. We are writing to explain our position — our directors postponed their meeting at our request because of our inability to make a full report on the fire loss. At the time of your meeting with the writer at Page's, you said that we would hear from you within a few days. Kindly communicate with us at once so that we may have the facts."

The defendant did not reply to these letters, but admitted on cross-examination that he had received them. He testified that he had a conversation over the telephone with Osterman as a result of the paragraph in the letter of September 15, 1930, beginning "According to our interpretation of the contract," and told him "he would try

to place the ice with the Hood and Whiting companies later in the season when their ice supply was gone."

Osterman testified that there was nothing to be done by the plaintiff to the ice after the contract was signed; that he mailed bills and statements to the defendant between June 14, 1930, and the time of the fire but made no other demand; that sometime after the fire the defendant came to Lowell and he met him at the office of the treasurer of the plaintiff; that the defendant said "he was glad that he had no insurance on this ice, that he would rather pay for the ice than have people think he bought it and destroyed it." MacDougall testified that when the ice arrived at Malden it could not be used; that at his request Osterman came to Malden to look at the ice; that he made an appointment with Osterman and the defendant to meet them at the ice house in June, at which time the men were throwing away a half car of ice from every car load removed from the ice house.

At the close of the testimony the plaintiff presented the following written motion for a directed verdict: "Now comes the plaintiff and moves that the jury be ordered to return a verdict in its favor for the value of the ice actually taken from the ice house in Littleton by the defendant, and also for the value of the ice in the ice house at Littleton at the time of the fire, less wastage in shipment from Littleton to Lowell." The motion was denied and the plaintiff duly excepted.

In support of this exception the plaintiff contends that the written, sealed agreement of the parties provides for the sale of specific ascertained goods, and that under the terms of that contract the title to the ice had passed to the defendant before October 22, 1930, the date of the fire. In support of its contention that such is the proper interpretation of the contract and was the time the parties to it intended the title to pass, the plaintiff directs attention to G. L. c. 106, § 20 (1), (2), more particularly (2), which reads: "For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract,

the conduct of the parties . . . and the circumstances of the case." It also directs attention to G. L. c. 106, § 21, which reads: "Unless a different intention appears, the following rules for ascertaining the intention of the parties as to the time when the property in the goods is to pass to the buyer shall govern: Rule 1. If there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment or the time of delivery, or both, be postponed. Rule 2. If there is a contract to sell specific goods and the seller is bound to do something to the goods for the purpose of putting them into a deliverable state, the property does not pass until such thing be done." It is argued by the plaintiff, and not otherwise by the defendant, that the ice sold was specific and was in a deliverable state when the contract was executed.

It is argued in support of said motion that under G. L. c. 106, § 32 (1), the place of delivery was at the ice house in North Littleton. The soundness of this argument is not controverted by the defendant. It is the contention of the plaintiff, undisputed by the defendant, that, following the agreement, possession of the ice houses at North Littleton was taken by the defendant who had actually shipped some of the ice away. This act of the defendant was at least evidence of a "voluntary transfer of possession" from the plaintiff to the defendant, as the word "Delivery" is defined by G. L. c. 106, § 65 (1). It is the further contention of the plaintiff that the intention of the defendant, if he had such at the time of the execution of the agreement, that the title should not then pass, was vain, because it was not an expressed intention common to both contracting parties. *Bohn Manuf. Co.* v. *Sawyer*, 169 Mass. 477, 482. *Farnum* v. *Whitman*, 187 Mass. 381, 383. This statement as a principle of law is not controverted by the defendant.

The plaintiff contends it was error to refuse to give request numbered 15 which reads: "The clause in the contract providing that the time of each payment for the

ice is of the essence of the contract has no bearing upon the question of whether the title had passed from the plaintiff to the defendant at the time of the fire." This provision manifestly was intended to have a force in the contract and clearly was applicable to so much of Rule 1 of § 21, *supra,* as provides: "it is immaterial whether the time of payment or the time of delivery, or both, be postponed." In legal effect the provision is a condition that the title shall not pass until the time of each payment, and is also a recognition of contemplated divisible deliveries and shipments from the ice houses with an agreement that if all the ice is not removed at once in no event is it to be left on the premises of the plaintiff after September 1, 1930. It is, however, contended by the plaintiff that the clause in question was intended to make certain the right of the seller to treat the failure to pay for an instalment of ice on its due date as a repudiation of the whole contract by the buyer, and that "it had absolutely no bearing on the question of passing of title," citing *National Machine & Tool Co.* v. *Standard Shoe Machinery Co.* 181 Mass. 275.

The plaintiff contends that the judge erred in his refusal to give request numbered 10, which reads: "If delivery of the ice was delayed through the fault of the defendant and through the failure of the defendant to remove the ice within the time allowed him under the contract of March 20, 1930, or any modification thereof, the goods are at the risk of the defendant as regards any loss which might not have occurred but for such fault or failure to remove." The request is evidently based on G. L. c. 106, § 24, which reads: "Unless otherwise agreed, the goods remain at the seller's risk until the property therein passes to the buyer, but when the property therein has so passed the goods are at the buyer's risk whether delivery has been made or not, except that . . . . (b) If delivery has been delayed through the fault of either buyer or seller, the goods are at the risk of the party in fault as regards any loss which might not have occurred but for such fault." This ruling was refused rightly. The record above quoted has abundant evidence, if believed, that the agreement as to the removal

of the ice and the time or times of such removal was modified to the effect that the defendant might remove the ice subsequently to September 1, 1930, to a time later in the fall or in cold weather, which the jury could reasonably find was later than the date of the fire.

Request numbered 18 that "Upon all the evidence, the burden of proving a 'different intention' within the meaning of G. L. c. 106, § 21, has not been sustained by the defendant," was denied rightly. The technical burden of proof was upon the plaintiff; the burden of going forward was upon the defendant. There was ample evidence to raise the issue of intention and to put the plaintiff to a rebuttal of the case made by the defendant.

We find no error in the judge's refusal to give any request which is argued by the plaintiff. At the close of the evidence there was submitted to the jury a special question which reads: "At the time of the fire, October 22, 1930, had the title to the ice passed to the defendant?" and the jury answered, "No." The judge charged the jury at length. The charge is reported in full. No exception was taken to it by plaintiff or defendant.

*Exceptions overruled.*